UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YACOUB HABIB,<br><br>    Plaintiff,<br><br>        v.<br><br>INSTITUTE FOR PROTEIN INNOVATION, INC. and TIMOTHY A. SPRINGER,<br><br>    Defendants. | Civil Action No. _____ |

**COMPLAINT**

Plaintiff Yacoub Habib brings this Complaint against Defendants Institute for Protein Innovation, Inc. and Timothy A. Springer arising out of the defendants' termination of the plaintiff's employment in violation of 26 U.S.C. § 7623, among other claims.

**Parties and Jurisdiction**

1. Plaintiff Yacoub Habib, Ph.D. is an individual residing in Miami, Florida.

2. On information and belief, Institute for Protein Innovation, Inc. ("IPI") is a Massachusetts nonprofit corporation with a principal place of business at 4 Blackfan Circle, Boston, Massachusetts. IPI is registered as an Internal Revenue Code Section 501(c)(3) non-profit public charity, specifically a medical research organization. It is also registered as a public charity with the Non-Profit Organizations/Public Charities Division of the Massachusetts Attorney General's Office.

3. On information and belief, Timothy A. Springer, Ph.D. is an individual with a principal place of business at 4 Blackfan Circle, Boston, Massachusetts. Dr. Springer is a co-founder of IPI. At all times relevant to the claims asserted in this Complaint, Dr. Springer served

as IPI's President and Executive Chairman of the Board.

4.     This Court has jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. § 1331 because one or more of the plaintiff's claims arises under the laws of the United States.

5.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within this District, namely in Boston, Massachusetts.

6.     The plaintiff has complied with all administrative prerequisites to this action. The plaintiff timely filed an administrative complaint with Secretary of Labor pursuant to 26 U.S.C. § 7623(d)(2)(A)(i) on July 6, 2020. More than 180 days have now passed since the filing of the plaintiff's complaint to the Secretary of Labor and the Secretary has not issued a final decision thereon. Accordingly, pursuant to 26 U.S.C. § 7623(d)(2)(A)(ii), the plaintiff may now file this action in this Court.

## Factual Allegations

7.     IPI was organized in 2016. Defendant Timothy Springer was a co-founder and made a charitable gift that was its primary source of initial funding. Dr. Springer served as IPI's President and was the Chairman of the Board of Directors until 2021.

8.     IPI's charitable, non-profit mission is ostensibly to conduct innovative medical research in collaboration with nonprofit hospitals and other organizations to empower protein research and pioneer new therapeutics that improve human health. IPI seeks to bridge genomics and health care by creating a library of antibodies to match to key receptors in order to develop new therapies.

### *The Plaintiff's Initial Purpose and Success*

9.     On or around January 16, 2019, IPI hired the plaintiff as Head of Business Development and Strategic Partnerships.

10. Dr. Springer was Dr. Habib's direct supervisor.

11. One of the goals outlined by Dr. Springer for Dr. Habib was pursuing "out-licensing" of some of IPI's antibodies. Licensing IPI's antibodies would assist IPI in becoming self-sustaining in support of its mission to achieve the maximum benefit for public health, and in attracting philanthropic, government, and private support.

12. Dr. Habib pursued that goal through, among other things, a key project to negotiate a deal with Harvard Medical School ("HMS") concerning accessing receptors that were developed by Dr. Andy Kruse, an HMS professor and a co-founder of IPI. These receptors, in combination with yeast antibodies owned by IPI and a novel technology that stabilizes receptors, could produce new and beneficial therapies.

13. Dr. Habib participated in challenging negotiations with HMS on behalf of IPI. By June 2019, Dr. Habib had successfully negotiated a preliminary agreement between HMS and IPI on terms that were very favorable to IPI. Dr. Habib had succeeded in persuading HMS to back down from certain hard line stances, yielding a venture that would have tremendous financial upside for IPI and which might attract future pharmaceutical and biotechnology companies to partner with IPI.

*The Introduction of Dr. Springer's For-Profit Company "Tectonic"*

14. During IPI's June 2019 quarterly Board meeting, Dr. Springer announced that IPI would soon have a "spin-out"— a for-profit company known as "Tectonic" that he and Dr. Kruse were co-founding, which would negotiate with both IPI and HMS to license technology.

15. Dr. Habib was perplexed by this announcement. IPI did not need Tectonic to achieve what IPI and Dr. Habib were already doing—negotiating a valuable partnership directly with HMS.

16. Dr. Springer further announced that he would be irrevocably transferring his

founder stock in Tectonic to IPI, and that he would recuse himself from any negotiations between IPI and Tectonic, all ostensibly to avoid any potential conflict of interest.

*Dr. Springer Begins to Pressure and Threaten the Plaintiff*

17. Dr. Springer's representations to the Board were not true.

18. In the summer of 2019, despite purportedly recusing himself from any negotiations among IPI, HMS, and Tectonic, Dr. Springer instructed Dr. Habib to inject Tectonic into the IPI/HMS negotiations. Dr. Spring explicitly made "finalize license with Tectonic" one of Dr. Habib's performance objectives. Moreover, Dr. Springer insisted that Dr. Habib stop pursuing the transaction that he had negotiated with HMS, and that Tectonic be inserted in the middle of IPI's business relationship with HMS.

19. Dr. Habib shared his view as to why keeping the transaction directly between IPI and HMS was in IPI's best interests. In the event that IPI and HMS discovered novel molecules, such discoveries could be licensed to the highest bidder (with IPI receiving 50% of any licensing revenues per its agreement with HMS), rather than being committed to Tectonic as the sole beneficiary.

20. In response to Dr. Habib's explanation of why it was in IPI's best interests to keep the deal between IPI and HMS, without involving Tectonic, Dr. Springer became angry and told the plaintiff, "Be smart!"

21. Following Tectonic's official formation on or around August 9, 2019, Dr. Springer instructed Dr. Habib to inform HMS that Tectonic would reach out to them directly to license the subject receptors. Tectonic would then transfer the receptors to IPI through a separate agreement.

22. Under this new arrangement, Tectonic was installed as an unnecessary "middle man" and was positioned to obtain the lion's share of the benefit resulting from IPI's work.

*The Plaintiff's Discovery of Dr. Springer's Ongoing Financial Interest in Tectonic*

23. After Tectonic was incorporated in August 2019, its newly-hired CEO, Chris Cortis, contacted Dr. Habib to commence the negotiations for the IPI technology that would be used with the HMS receptors.

24. Dr. Habib requested, among other things, that IPI receive an additional 5% equity interest in Tectonic as an up-front payment, other development and commercialization milestones and royalties, and that it not be required to give Tectonic an exclusive license to its novel stabilization technology.

25. Cortis' counter-offer was limited to Dr. Springer's founder shares in Tectonic—the same shares that Dr. Springer had pledged to transfer irrevocably to IPI in June 2019 to avoid potential conflicts of interest.

26. Dr. Habib noted to Cortis that those shares had already been pledged to IPI. Cortis responded that Dr. Springer had informed him that the pledge was conditioned on a "workable agreement" being reached with IPI.

27. At IPI's September 2019 Board meeting, Dr. Springer formally reversed his pledge of shares in Tectonic, saying it was "delayed" until a deal between IPI and Tectonic was finalized.

28. Dr. Springer's direct involvement in IPI's negotiations with Tectonic—exerting pressure on Dr. Habib to make the deal favorable to Tectonic—also persisted. During a one-on-one meeting with Dr. Habib, Dr. Springer insisted that Tectonic receive an exclusive license from IPI for the novel technology.

29. Dr. Springer also attempted to undermine IPI's position with Tectonic by pushing for IPI to abandon contractual protections that would have prevented Tectonic from developing its own library of yeast antibodies—one of IPI's most important properties—with assistance

from a former IPI employee. The individual who had helped develop that library for IPI had left the company, but was subject to a contractual restriction that prevented him from working for competitors to develop a competing library. Dr. Springer pushed for IPI to release the former employee from him contract, allowing him to work with Tectonic—all to the detriment of IPI with no identifiable benefit.

30. In October 2019 Dr. Habib learned that, in addition to his founder's shares, Dr. Springer had an additional financial interest in Tectonic. Specifically, Dr. Springer had pledged $5 million in cash in exchange for a convertible note that would be converted into preferred shares upon a Tectonic financing event. Thus, even if he pledged his founder's shares in Tectonic to IPI, Dr. Springer still stood to personally and substantially benefit from Tectonic's dealings with IPI and HMS.

*The Plaintiff's Concerns and Efforts to Blow the Whistle*

31. In light of these discoveries, Dr. Habib reasonably believed that Dr. Springer's conduct, individually and in concert with others, constituted a violation of the internal revenue laws and other federal law relating to tax fraud.

32. An organization claiming § 501(c)(3) exempt status is obligated to ensure that "no part of the net earnings of [the organization] inures to the benefit of any private shareholder or individual." Moreover, a 501(c)(3) organization is obligated to be "both organized and operated exclusively for one or more of the purposes specified in [§ 501(c)(3)]." The conduct discovered by Dr. Habib violated these obligations, as Dr. Springer was attempting to personally benefit (indirectly through his for-profit corporation, Tectonic) from dealings of Tectonic with IPI, and also to use IPI as a vehicle for the purpose of siphoning pecuniary benefit to a for-profit company, Tectonic, contrary to its obligation to operate exclusively for the tax-exempt purpose of charitable medical research.

33. Dr. Springer's efforts to prevent discovery of his pecuniary interest was designed to avoid the negative tax consequences of those violations, including but not limited to tax liability under 26 U.S.C. § 4958 for engaging in an "excess benefit transaction."

34. Dr. Habib took several steps to oppose this conduct. He notified IPI's attorney William "Bill" Wofford of Hutchinson PLLC, who had been working on documents for the IPI/Tectonic agreement. Dr. Habib asked Attorney Wofford to disclose Dr. Springer's interest in Tectonic and his attempts to have IPI transact with Tectonic to J. Scott Merrell, Wofford's law partner, who served as IPI's counsel and was a member of IPI's Conflict of Interest Committee ("COI Committee"). Attorney Merrell then confirmed to Dr. Habib in an email, copying the members of the COI Committee, that he had not previously been aware of Dr. Springer's $5 million investment in Tectonic.

35. Dr. Habib also sent the financial documents showing Dr. Springer's financial interest in Tectonic to IPI's COI Committee.

36. Dr. Habib also spoke to an outside investigator, Isaac Kohlberg, whom Mr. Merrell subsequently hired to investigate the matter for IPI and provided the investigator with financial documents showing Dr. Springer's financial interest in Tectonic.

### *The Plaintiff's Report to the Board Despite Dr. Springer's Further Warning, and his Nearly Immediate Termination*

37. On or about December 6, 2019, before the next IPI quarterly Board meeting, Dr. Springer lambasted Dr. Habib over the appointment of Kohlberg, and told him angrily that he had better ensure "smooth sailing" of the IPI/Tectonic deal through IPI's COI Committee.

38. Nevertheless, Dr. Habib informed the COI Committee and IPI's Board of the true facts surrounding the IPI/Tectonic transaction, including Dr. Springer's interest in Tectonic.

39. Shortly thereafter, on January 8, 2020, upon his return from a vacation, Dr. Habib

met with Dr. Alex Burgin, who had been hired as IPI's new Executive Director in early December 2019. Dr. Burgin had been made Dr. Habib's formal supervisor, and Dr. Habib intended to use the meeting to discuss his earned bonuses, 2019 accomplishments, and 2020 objectives.

40. Dr. Burgin spent most of this meeting on January 8, 2020 questioning Dr. Habib about the issues arising from Dr. Springer's interest in Tectonic. Dr. Habib repeated, and did not backtrack from, the same information he had shared with the Board in December.

41. Two days later, on January 10, 2020, Dr. Burgin called Dr. Habib and told him that he was being terminated because his "position was eliminated" and he was not needed.

## **COUNT I: Retaliation in Violation of the Taxpayer First Act, 26 U.S.C. § 7623(d)**
**(Both Defendants)**

42. The plaintiff realleges and incorporates by reference each of the above numbered paragraphs as if fully set forth herein.

43. By and through the conduct set forth above, IPI and Dr. Springer discharged, demoted, threatened, harassed, and otherwise discriminated against the plaintiff in his terms and conditions of employment in reprisal for lawful acts done by the plaintiff to provide information, cause information to be provided, or otherwise assist in an investigation regarding the underpayment of tax, or conduct which the plaintiff reasonably believed constituted a violation of the internal revenue laws or other provisions of Federal law relating to tax fraud.

44. The conduct about which the plaintiff provided information included conduct that he reasonably believed violated or was likely to violate 26 U.S.C. § 501(c)(3).

45. As a direct and proximate result thereof, the plaintiff has suffered and continues to suffer damages, including but not limited to the loss of compensation and benefits, reputational harm, other financial losses, and emotional distress damages.

## COUNT II: Wrongful Termination in Violation of Public Policy
### (Both Defendants)

46. The plaintiff realleges and incorporates by reference each of the above numbered paragraphs as if fully set forth herein.

47. Directors and officers of Massachusetts public charities have a fiduciary duty of loyalty, including related to transactions involving improper personal benefit.

48. Because of the public interest served by public charities, Massachusetts law gives broad authority to the Massachusetts Office of the Attorney General ("AGO") to regulate, investigate, and otherwise address breaches of trust or other unethical behavior in the administration of a public charity.

49. The plaintiff's internal disclosures were in furtherance of the public interests protected by such Massachusetts statutory and regulatory provisions.

50. As such, the plaintiff's internal disclosures were protected by Massachusetts public policy. The defendants' retaliatory conduct was in violation of Massachusetts public policy, entitling the plaintiff to monetary damages caused by such conduct.

## COUNT III: Tortious Interference with Contractual Relationship
### (Defendant Springer)

51. The plaintiff realleges and incorporates by reference each of the above numbered paragraphs as if fully set forth herein.

52. The plaintiff had a valid contractual agreement with IPI for employment.

53. Defendant Springer knowingly interfered with that contract through the conduct described above, including altering the plaintiff's employment objectives to benefit Tectonic, threatening and harassing the plaintiff, and, on information and belief, instructing Dr. Burgin to terminate the plaintiff's employment.

54. Defendant Springer's interference was improper in motive and means. Specifically, it was designed to benefit his own financial interests at the expense of IPI, to cover up his scheme to obtain a financial benefit in violation of public charities laws, and to engage in retribution against the plaintiff for his efforts to bring Dr. Springer's scheme to the attention of IPI's Board of Directors.

55. As a direct and proximate result of defendant Springer's interference with the contractual relationship between the plaintiff and IPI, the plaintiff was harmed and is entitled to recover damages.

## COUNT IV: Breach of Contract
### (Defendant IPI)

56. The plaintiff realleges and incorporates by reference each of the above numbered paragraphs as if fully set forth herein.

57. The plaintiff had a valid employment contract with IPI that provided a bonus of 30% of his annual salary commensurate with performance milestones.

58. The plaintiff achieved his performance milestones for the year 2019.

59. As a result, IPI owed the plaintiff a bonus of 30% of his salary, which IPI failed to pay the plaintiff.

60. IPI's failure to pay the plaintiff his bonus was a breach of the contract.

61. The plaintiff did not materially breach the contract.

62. Due to IPI's breach of the contract, the plaintiff suffered economic harm for which IPI is liable.

**Prayer for Relief and Jury Demand**

WHEREFORE, the plaintiff respectfully requests that the Court:

A. Enter judgment in favor of the plaintiff on his claims against the defendants;

B. Award the plaintiff monetary damages, including for lost compensation, back pay, lost benefits, reputational harm, and emotional distress, with interest;

C. Award the plaintiff front pay;

D. Award the plaintiff punitive damages;

E. Award the plaintiff his attorneys' fees and all other costs of litigation; and

F. Order such other and further relief as the Court deems appropriate under the circumstances.

**Demand for Jury Trial**

The plaintiff hereby demands a trial by jury on all claims that are so triable.

Respectfully submitted,

YACOUB HABIB,

By his attorney,

/s/ Joshua A. McGuire
Joshua A. McGuire (BBO #651877)
The Law Office of Josh McGuire
189 Wells Avenue, Suite 200
Newton, MA  02459
(617) 461-6400
josh@joshmcguirelaw.com

Dated:  January 10, 2023